NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0365n.06

No. 18-3949

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 16, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| In re: MOHAMMAD ZAKI AMAWI, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| Movant. | ) ) ) ) | THE NORTHERN DISTRICT OF OHIO |

Before: GUY and NALBANDIAN, Circuit Judges.[1]

NALBANDIAN, Circuit Judge.   Mohammad Zaki Amawi seeks authorization to file a second or successive habeas petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Amawi argues that the Supreme Court's decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), invalidates his convictions because it found 18 U.S.C. § 16(b) unconstitutionally vague. But because Amawi's convictions qualify as "crimes of violence" under 18 U.S.C. § 16(a), which remains untouched by *Dimaya*, we deny his motion.

**I.**

Back in 2008, a jury convicted Amawi for his part in a terrorist conspiracy. The conspiracy was to kill and maim people outside the United States, *see* 18 U.S.C. § 956(a)(1)—and to provide material support to help terrorists kill Americans. *See id.* § 2339A. To accomplish this, Amawi distributed information on how to create chemical explosives and suicide-bomb vests. *See* 18

---

[1] Judge Guy and Judge Nalbandian act as a quorum pursuant to 28 U.S.C. § 46(d) in view of Judge Gibbons's unavailability.

U.S.C. § 842(p)(2)(A). The district court sentenced him to 240 months in prison. Amawi appealed, and we affirmed. *United States v. Amawi*, 695 F.3d 457, 465 (6th Cir. 2012).

Amawi then filed his first § 2255 motion, raising claims about illegally obtained evidence, failure to disclose evidence, and ineffective assistance of counsel. The district court denied his motion, and Amawi did not appeal. *United States v. Amawi*, No. 3:06-cr-719, 2014 WL 5795551 (N.D. Ohio Nov. 6, 2014).

Then we decided *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016), where we addressed the constitutionality of the term "crime of violence" as defined in 18 U.S.C. § 16. The § 16 definition has two parts—subsections (a) and (b). *Shuti* addressed only the latter, known as the residual clause, holding that § 16(b) is unconstitutionally void for vagueness. 828 F.3d at 446–47 (relying on *Johnson v. United States*, 135 S. Ct. 2551 (2015)). The Supreme Court agreed in *Sessions v. Dimaya*, confirming that the residual clause definition is unconstitutional. 138 S. Ct. 1204 (2018). But to be sure, both *Shuti* and *Dimaya* left § 16(a) untouched. This means that a "crime of violence" is still defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a) (known as the "elements clause").

These cases opened a new door for Amawi. The jury convicted him under 18 U.S.C. § 842(p)(2)(A), which for Amawi, made it unlawful to distribute his information about explosives and suicide vests if Amawi intended the recipients to use his information to commit "crimes of violence." To define this term, both the superseding indictment and jury instructions relied on the definition in § 16—including references to subsections (a) and (b). So Amawi filed a second habeas petition, arguing that his convictions were now invalid because § 16(b)'s definition is unconstitutional. *See* 28 U.S.C. §§ 2244(b), 2255(h). Said another way, Amawi argues that we must vacate his § 842 convictions because his underlying crimes are no longer "crimes of

violence." Permission to proceed is sought on the grounds that he has made a prima facie showing that his second or successive § 2255 motion it is based on *Dimaya*, which the government agrees established a new and retroactive rule of constitutional law that was previously unavailable.

But for Amawi to make that showing, his relevant convictions must fall exclusively under § 16(b), which is now unconstitutional, rather than § 16(a), which remains valid. The jury found that Amawi distributed his information, in violation of § 842, to commit two crimes. The first was under 18 U.S.C. § 1114, killing or attempting to kill a United States employee engaged in the performance of that person's official duties. And the second, under 18 U.S.C. § 2332, is killing a United States national outside the United States. Both crimes provide that the killing can occur by murder or manslaughter, which includes both voluntary and involuntary manslaughter.

Amawi argues that § 1114 and § 2332 cannot be "crimes of violence" under § 16(a) because they both include involuntary manslaughter. And at least one circuit has concluded that involuntary manslaughter is not a crime of violence. *See United States v. Benally*, 843 F.3d 350, 351 (9th Cir. 2016). The government, however, disagrees—arguing that Amawi's crimes remain "crimes of violence" under § 16(a).

**II.**

To determine whether a conviction qualifies as a "crime of violence," we employ the categorical approach. *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016). This often takes the form of a three-step inquiry. *See, e.g.*, *Gutierrez v. Sessions*, 887 F.3d 770, 774 (6th Cir. 2018); *United States v. Ritchey*, 840 F.3d 310, 315–16 (6th Cir. 2016). Step one looks at "the statutory definition of the . . . offense rather than the underlying facts of the conviction," and asks whether the "predicate conviction . . . involves violent physical force." *Perez v. United States*, 885 F.3d 984, 987 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1259 (2019). At this step, we cannot analyze

Amawi's crimes to determine whether they were violent. Instead, "we must engage in a hypothetical exercise to determine whether the crime[s'] elements could be committed in a non-violent fashion." *Lowe v. United States*, 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring). We are thus concerned with finding "the least forceful conduct generally criminalized under the statute." *Perez*, 885 F.3d at 987.

For both of Amawi's underlying crimes, the hypothetical "least forceful" conduct is involuntary manslaughter. *See* 18 U.S.C. § 1114(2) (referencing 18 U.S.C. § 1112, which includes voluntary and involuntary manslaughter); *id.* § 2332(a)(2)–(3) (same). So the question, under step one, is whether involuntary manslaughter involves the use of violent physical force.

This question is where the Ninth Circuit started and finished in *Benally*. Looking at 18 U.S.C. § 1112, the Ninth Circuit explained that involuntary manslaughter requires a mental state of only gross negligence. Said differently, involuntary manslaughter includes "accidental conduct." *Benally*, 843 F.3d at 353–54. And if an individual accidently uses force against another person, according to the Ninth Circuit, the accidental nature of the force means that the individual did not intend to use violent physical force. *See id.* For example, we would think of someone using physical force when they push someone—but we would not think of someone using physical force when they accidently stumble and fall into someone. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Following this reasoning, any statute that includes involuntary manslaughter is not categorically a crime of violence.

Amawi asks us to adopt *Benally's* reasoning. But even if we were inclined to do so (a question we need not and do not answer here), it would not end our analysis. The Ninth Circuit did not address steps two and three of the categorical approach, often called "the modified categorical approach." *Id.* at 352. In step two, we ask whether the relevant statute is divisible. A

statute is divisible if it specifies different methods for violating the same statute—resulting in the creation of distinct crimes. *Guiterrez*, 887 F.3d at 774; *United States v. Mitchell*, 743 F.3d 1054, 1065 (6th Cir. 2014). If so, we move to step three, which tries to figure out which alternative crime the defendant committed (a violent one or a non-violent one). To accomplish this, we can look at certain trial court documents, known as *Shepard* documents. *Descamps v. United States*, 570 U.S. 254, 257 (2013). If the documents establish that the defendant's conduct fell under the method that qualifies as a crime of violence, it does not matter that other hypothetical conduct could also be considered non-violent conduct under the statute.

In sum, step two asks whether there are distinct crimes under the same statute: one that would qualify as a crime of violence under § 16(a)—and another that would not. And step three attempts to figure out which alternative crime the defendant was charged with and convicted. For Amawi, regardless of whether involuntary manslaughter is categorically a crime of violence, the relevant statutes here are divisible—and the *Shepard* documents show that Amawi's conduct falls under first-degree murder (undeniably a crime of violence), rather than involuntary manslaughter.

**III.**

For step two, we start with the language of the statute, looking for the elements required to violate the statute. *Gutierrez*, 887 F.3d at 774–75 (relying on *Mathis*, 136 S. Ct. at 2248–49). If the statute contains a single set of elements that define a single crime, the statute is indivisible, and our inquiry ends. *Id.* This is true even when a statute lists different factual scenarios to commit the same crime. For example, a statute could make it unlawful to assault someone with a "deadly weapon." *See Mathis*, 136 S. Ct. at 2249. And then the statute could "further provide[ ] that the use of a knife, gun, bat, or similar weapon would all qualify" as a "deadly weapon." *Id.* This list

does not create distinct crimes, but instead, "spells out various factual ways of committing [the same] offense." *Id.*

But if the statute includes a list of alternative elements (rather than facts) that define several crimes, the statute is divisible, and we move to step three. *See id.* at 775. For example, we recently recognized that when a statute contains enumerated subsections, each of which criminalizes different conduct, the statute is divisible. *See United States v. Burris*, 912 F.3d 386, 402 (6th Cir. 2019) (en banc) (analyzing Ohio Rev. Code § 2903.11(A)). In *Burris*, we explained how Ohio's felonious assault statute is divided into two crimes, subsection (A)(1) and (A)(2): "The difference is that subsection (A)(1) applies when the defendant caused *serious* physical harm, and subsection (A)(2), requiring only physical harm, applies when the defendant used a deadly weapon or dangerous ordnance." 912 F.3d at 408 (Thapar, J., concurring), *accord id.* at 405 (Batchelder, J., delivering the majority opinion). Each subsection requires the government to prove different elements. Similarly, we also know that a statute is divisible when it contains alternative crimes that carry different punishments. *Id.* at (quoting *Mathis*, 136 S. Ct. at 2256).

Here, § 2332 and § 1114 include enumerated, alternative ways to violate the same statutes. And both statutes create wildly different punishments for each alternative crime. Under § 2332(a), it is generally a crime to kill "a national of the United States, while such national is outside the United States." But this killing can occur in three different ways: by murder, voluntary manslaughter, or involuntary manslaughter, 18 U.S.C. §§ 2332(a)(1)–(3), with each type of killing requiring different elements. For example, "[m]urder is the unlawful killing of a human being *with* malice aforethought," 18 U.S.C. § 1111(a) (emphasis added), while "[m]anslaughter is the unlawful killing of a human being *without* malice." *Id.* § 1112(a) (emphasis added). And each

type of killing carries a different punishment, ranging from a death sentence or life in prison for murder—to a mere fine or a maximum of three years in prison for involuntary manslaughter. *Id.*

Likewise, under § 1114, it is generally a crime to "kill or attempt[ ] to kill any officer or employee of the United States . . . while such officer or employee is engaged in . . . the performance of official duties." This killing, too, can occur in the same enumerated ways: by murder or manslaughter. *See* 18 U.S.C. § 1114(1)–(2). And each type of killing produces a different punishment, ranging from a death sentence or life in prison for first-degree murder, *see* 18 U.S.C. § 1111(b)—to a simple fine or a maximum of eight years in prison for involuntary manslaughter, *see id.* § 1112(b). As a result, both § 2332 and § 1114 are divisible statutes.

## IV.

This takes us to the third and final step of our analysis. When a statute is divisible, we can look at certain *Shepard* documents to determine which statutory alternative the defendant was charged and convicted under. In other words, "when a statute . . . refers to several different crimes, not all of which qualify as [a crime of violence], a court must determine which crime formed the basis of the defendant's conviction." *Descamps*, 570 U.S. at 263. To find this answer, a court can "consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis" of the defendant's crime. *Id.* at 257; *Johnson*, 559 U.S. at 144 (permitting a court to "consult[ ] the trial record—including charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms").

So we must look at the trial record to determine whether Amawi's § 2332 and § 1114 convictions fall under murder or manslaughter. If Amawi's conduct falls under the former, "[i]t cannot be seriously argued that murder is anything other than a crime of violence." *United States*

*v. Darden*, 346 F. Supp. 3d 1096, 1133–34 (M.D. Tenn. 2018) (collecting cases finding that § 1111 murder is a crime of violence under the elements clause). As a result, Amawi's § 842 convictions would remain valid because the underlying crimes would still qualify as "crimes of violence" under § 16(a), which remains constitutionally sound post-*Shuti* and *Dimaya*.

Looking to Amawi's superseding indictment, he was charged with providing information about constructing suicide-bomb vests and manufacturing chemical explosives. As for intent, the superseding indictment explained that Amawi wanted martyrs to use his materials, including step-by-step instructions, to construct suicide vests and chemical explosives to kill Americans. (R. 186 at 702–04.) Indeed, the district court emphasized this intent at sentencing, explaining that once Amawi started looking at the videos, he "started talking about engaging in violent jihad, engaged in violent activities . . . [and] started talking about ultimately participating in the insurgency." (R. 1044 at 34.) And once Amawi distributed the instructional videos, the district court explained that "Mr. Amawi, of the three defendants, most directly expressed a desire to injure American soldiers. . . . He endorsed the concept of martyrdom, which I understand in this context means dying while engaged in hostile acts against one's perceived enemies. He is clearly, I think, enraptured by images of the killings of Americans and others, and he was enraged." (*Id.* at 37.)

This is not the "accidental" conduct that the Ninth Circuit was concerned about in *Benally*. *See* 843 F.3d at 353–54. Instead, this activity can logically fall within only one portion of § 1114 and § 2332—first-degree murder—which is "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). The murder statute is specifically aimed at the crimes contemplated here: killings stemming "from a premeditated design unlawfully and maliciously to effect the death of any human being." *Id.* Neither of the manslaughter offenses, defined as "the unlawful killing of a human being *without malice*," can cover the premeditated killings planned

here. *Id.* § 1112 (emphasis added). As a result, Amawi's relevant convictions—distributing information to help murder Americans—remain valid because they qualify as "crimes of violence" under § 16(a). We deny Amawi's motion for authorization to file a second or successive § 2255 motion.